UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

THE HON. THOMAS A. CELLUCCI, PHD,      :
MBA; STEPHEN GOODMAN, MBA, ESQ.;       :
DAVID D. SINGER; MARK A. BANASH, PHD,  :
MBA; AND ROBERT ALLAN CAMPBELL,        :
MBA, EACH ONE INDIVIDUALLY AND         :
DERIVATIVELY ON BEHALF OF              :
DARKPULSE, INC.,                       :
                                       :
                          Plaintiffs,  :           19-CV-2752 (VEC)
                                       :
          -against-                    :           OPINION AND ORDER
                                       :
                                       :
DENNIS MICHAEL O'LEARY,                :
INDIVIDUALLY AND AS OFFICER AND        :
DIRECTOR OF DARKPULSE, INC.;           :
DARKPULSE, INC.,                       :
                                       :
                          Defendants.  :

------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__02/28/2020_

Plaintiffs are minority shareholders and former officers of Defendant DarkPulse, Inc.

(DarkPulse), a tiny, thinly traded company that may—or may not—have technology that has

value. Plaintiffs bring both individual and derivative claims against DarkPulse and its director,

Dennis O'Leary, for breach of fiduciary duty, violations of the corporate charter and by-laws,

waste, breach of contract, and whistleblower retaliation under the Dodd-Frank Act (15 U.S.C. §

78u-6). Defendants moved to dismiss pursuant to Rule 12(b)(6) for failure to state a claim as to

all causes of action. The motion is granted, with leave to amend as set forth below.

## I.    BACKGROUND

For purposes of resolving this motion, the Court accepts as true all well-pleaded factual

allegations. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

Allegations based on "information and belief" are accepted only if they are non-conclusory and

pertain to "facts [that] are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted).

As alleged, Defendant DarkPulse is a publicly traded company organized under Delaware law. First Amended Complaint ("FAC") (Dkt. 64) ¶ 28. The company reportedly specializes in providing technology that "detects changes in the 'structural health' of infrastructure," such as by monitoring perimeters and discovering tunnels. *Id.* ¶ 29. Defendant O'Leary serves as DarkPulse's president, chief executive officer, and sole board member.[1] *Id.* ¶ 30. As of March 13, 2019, O'Leary owned equity shares representing 67.14% of voting power in DarkPulse, *id.* ¶ 32; Plaintiffs Thomas Cellucci, David Singer, Mark Banash, and Robert Campbell collectively owned shares representing 13.57% of the voting power, *id.* ¶¶ 18, 21, 24, 27. With the exception of Campbell, Plaintiffs are also former officers of DarkPulse. *Id.* ¶¶ 16, 19, 22, 25.

The Complaint alleges, in conclusory fashion, that every Plaintiff "was a shareholder of DarkPulse at the time of the transactions that are the subject of the Complaint and/or his stock thereafter devolved upon him by operation of law," citing only an SEC filing dated March 13, 2019. *Id.* ¶¶ 18, 21, 24, 27. The FAC does not allege when each Plaintiff first acquired shares in DarkPulse, nor does it allege that each Plaintiff has continued to own shares of DarkPulse as of the filing of the amended complaint on July 11, 2019. Exhibit C of the FAC is an SEC filing dated May 4, 2018, showing that Cellucci, Banash, and Singer (but not Campbell) owned shares of DarkPulse's predecessor, Klever Marketing, Inc. *See id.*, Ex. C (Dkt. 64-1) at 4.

---

[1]    Defendants contend that O'Leary is no longer the sole board member for DarkPulse. Defs Br. (Dkt. 72) at 18 n.8. That fact is outside of the pleadings, and Defendants have not explained why it may be considered by the Court for purposes of this motion. *See id.*

Plaintiffs bring derivative actions as shareholders as well as individual actions on their own behalf against DarkPulse or O'Leary, alleging breaches of fiduciary duty, waste or conversion, breach of contract, and whistleblower retaliation. *See generally* FAC (Dkt. 64).

## A. Plaintiffs' Ouster from DarkPulse

Cellucci was formerly a director and co-chief executive officer of DarkPulse; Singer was formerly the chief marketing officer; and Banash was formerly the chief technology officer. *Id.* ¶¶ 16, 19, 22. Campbell was chief operating and financial officer for Klever Marketing, Inc., which preceded DarkPulse. *Id.* ¶¶ 25, 43. Cellucci was allegedly appointed a director of DarkPulse in late January 2018 and co-chief executive officer in early February 2018; there is no allegation as to when the remaining Plaintiffs began serving as officers of DarkPulse. *See id.* ¶¶ 16, 19, 22.

Article X of DarkPulse's certificate of incorporation and Article 3 of its by-laws provide for a governing board of at least three directors. *Id.* ¶¶ 49–50. As the majority shareholder during all relevant times, O'Leary had the power to appoint and remove, with or without cause, members of the board. *Id.* ¶ 51; DarkPulse Charter (Dkt. 64-1), Art. III, Sec. 15. DarkPulse allegedly operated with only two directors (O'Leary and Cellucci) from July 18, 2018 (the date of the reverse merger of Klever Marketing and DarkPulse), until February 14, 2019, when Cellucci was ousted as director, leaving O'Leary as the sole director. *Id.* ¶¶ 16, 51, 57.

According to Article V, Section 5 of DarkPulse's by-laws, the removal of an officer can be effectuated "at any time by the affirmative vote of a majority of the board of directors." *Id.* ¶ 59. The by-laws further state that officers "shall hold office until their successors are chosen" by the board of directors. *Id.* ¶ 59. On March 6, 2019, DarkPulse filed a Form 8-K, announcing the termination of Cellucci as co-chief executive officer, allegedly on the basis of "shareholder

consent," rather than a vote by the board of directors.  *Id.* ¶ 58.  Banash and Singer were

terminated on March 18 and 19, 2019, respectively.  *See id.* ¶¶ 19, 22.  The FAC does not specify

how the decisions to remove Banash and Singer were made.  Plaintiffs claim that no successor

had been chosen for any of the ousted officers prior to his termination.  *Id.* ¶¶ 59, 91.

### B.  O'Leary's Alleged Diversion of DarkPulse's Resources to Other Entities

Plaintiffs accuse O'Leary of engaging in various activities that benefit O'Leary at

DarkPulse's expense.

First, O'Leary allegedly formed DarkPulse Technologies International, Inc. ("DPTI-

DE"), a Delaware entity, which in turn owns 100% of a New York entity of the same name

("DPTI-NY"), which was founded in 2017 by O'Leary.  *Id.* ¶¶ 66, 69.  DarkPulse allegedly owns

37.572% of DPTI-DE; the holder of the remaining interest is unknown to Plaintiffs.  *Id.* ¶ 70.

Plaintiffs claim that DPTI-DE and DPTI-NY became the "DarkPulse entities who [sic] dealt with

Russia," which had the effect of "divert[ing] approximately 63% of benefit from [Russian]

opportunities that would be available to DarkPulse to other entities controlled by Mr. O'Leary"

and the other owner(s) of DPTI-DE.  *Id.* ¶ 70.  Plaintiffs do not specify what those opportunities

are or why they believe those unspecified opportunities would have been available to DarkPulse

without the use of DPTI-DE and DPTI-NY.  They simply allege, "upon information and belief,"

that DarkPulse has been providing "assets, funding, and resources" to DPTI-DE and DPTI-NY,

while neither of those entities has "contributed any demonstrative funding for the prospective

project."  *Id.* ¶ 70.

Plaintiffs also allege, in conclusory and speculative fashion, that O'Leary is "involved

with" a Russian entity known as DarkPulse East, LLC, which was founded by two non-parties,

Julian Aranov and Ramey Rebea, in December 2017.  *See id.* ¶¶ 62, 65.  Plaintiffs do not explain

the nature of the suspected involvement. Although Plaintiffs allege that "there appears to be no ownership by DarkPulse Inc. in DarkPulse East," they also allege that O'Leary's failure to disclose the existence of DarkPulse East to DarkPulse's chief financial officer suggests foul play of some kind. *See id.* ¶¶ 62–64. Plaintiffs do allege that O'Leary made two payments of $20,650, once from DPTI-NY and once from DarkPulse, to Aranov to establish an office in Russia. *Id.* ¶ 68. Although Plaintiffs claim that the payment raised a "red flag for DarkPulse's auditors," they do not elaborate further. *Id.* ¶ 68.

Finally, Plaintiffs claim that DarkPulse's auditors were fired after they "raised questions" upon their completion of an audit. *Id.* ¶ 74. Plaintiffs, however, do "not know[] what was discussed" among the auditors, O'Leary, and the company's counsel before the auditors were terminated. *Id.* ¶ 74.

Based on those allegations, Plaintiffs assert, "upon information and belief," that "O'Leary personally benefitted from the diversion of DarkPulse's corporate assets to DPTI-NY, DPTI-DE, and DarkPulse East." *Id.* ¶ 73.

### C. O'Leary and DarkPulse's Alleged Non-Compliance with Export Controls

DarkPulse allegedly possesses a prototype device that can "monitor strain and temperature" in certain infrastructure, such as pipelines. *Id.* ¶ 75. Banash, one of the Plaintiffs, reportedly heard from unspecified manufacturers of the device's component parts that at least some of those parts may be subject to restrictions under the Export Administration Regulations, 15 C.F.R. § 730 *et seq*. *Id.* ¶ 75. Plaintiffs allegedly "have a real concern" that O'Leary may violate export control laws by sending the device to Canada and to Russia. *Id.* ¶ 76. Plaintiffs, however, do not appear to have any direct knowledge as to whether the prototype is subject to export control, as they have failed to identify any specific provision of law that Defendants

would violate if they transferred the prototype outside of the United States.  Nor do Plaintiffs

make any allegations as to whether DarkPulse or O'Leary may have obtained permission to

export the device, even if it were subject to export restrictions.  Furthermore, Plaintiffs have not

alleged that Defendants, in fact, exported the device unlawfully.

### D.  O'Leary and DarkPulse's Appointment of New Counsel

Plaintiffs allege that DarkPulse and O'Leary retained new counsel—after prior counsel

withdrew due to a conflict—without consulting DarkPulse's officers.  *Id.* ¶¶ 77–78.  They do not,

however, point to any obligation on the part of O'Leary to consult DarkPulse's officers before

doing so.  The FAC also does not allege when new counsel was retained.

### E.  O'Leary's Alleged Efforts to Mislead or Withhold Information from Shareholders and the Public

Plaintiffs accuse O'Leary of misleading shareholders and the public, in breach of his

fiduciary duty and Securities and Exchange Commission (SEC) regulations concerning

disclosure, including by posting inaccurate statements on social media.  Those statements

include: an assertion that O'Leary raised over $30 million for DarkPulse and that the company

had a valuation of $1.5 billion; a tweet about finalizing a $1 billion deal with an Indian agency; a

Facebook post stating that "Saudi Arabia = done"; statements implying that DarkPulse would be

used for the United States' border wall; and a claim that O'Leary had paid for the patents for

DarkPulse's technology.[2]  *Id.* ¶ 97, 99–103, 108.

The FAC provides dates for only two allegedly misleading messages.  Plaintiffs allege

that on December 28, 2017, O'Leary falsely tweeted that everything that O'Leary or Dr. Cellucci

had "said was 'in the works' has actually been completed."  *Id.* ¶ 105.  The FAC does not,

---

[2]     The FAC also alleges that O'Leary implied on social media that DarkPulse's technology had
telecommunications applications by posting the image of an agreement in response to a question.  FAC (Dkt. 64) ¶
104.  The FAC, however, does not allege that O'Leary's statement was false.

however, allege what Cellucci and O'Leary had claimed was "in the works," nor does it allege why or how O'Leary's tweet was false. On September 21, 2018, O'Leary allegedly sent an email stating that he had closed a Mexican joint venture, while at the same time asking DarkPulse's counsel for a joint venture template—from which Plaintiffs inferred that O'Leary had not, in fact, closed the deal. *Id.* ¶ 112. Plaintiffs do not specify the recipients of that email, nor do Plaintiffs explain how the email would have been misleading to the public.

Plaintiffs also plead, in the alternative, that O'Leary failed to provide to the public material information about the supposedly consummated deals that he announced on social media. *Id.* ¶ 109. They also allege that O'Leary failed to provide information to shareholders about meetings with potential clients in Arizona and in Italy, and a purported joint venture with an entity known as Paulsson, Inc. *Id.* ¶¶ 113–14.

### F. O'Leary's Alleged Mismanagement of DarkPulse's Assets and Business Opportunities

Plaintiffs' final series of allegations is a hodgepodge of complaints about a variety of decisions and actions taken by O'Leary that Plaintiffs find unwise. Those allegations include missing important meetings and calls with investors, being personally involved with a technology demonstration despite his relative lack of expertise, spending $6,895 to replace a defective component that could have been repaired, reallocating engineering resources from an agreed-upon deal to a prospective one, choosing one engineering software over others, refusing to expend money on marketing, losing certain project documents, rejecting certain business opportunities in favor of a project in Russia, failing to adequately utilize the skillsets of his officers, and proposing to use proprietary code developed by a university. *Id.* ¶¶ 116–28.

### G. DarkPulse's Alleged Breach of Employment Contracts

Three Plaintiffs (Cellucci, Banash, and Singer) allege unpaid compensation pursuant to their employment agreements. Cellucci claims that he is owed $56,000 in unpaid compensation pursuant to an alleged contract, the terms of which are not alleged in the FAC. *Id.* ¶¶ 271–72. He alleges, in conclusory terms, that he performed under the agreement but that he did not receive all of his compensation. *Id.* Using identical language, Banash alleges that he is owed $49,200, and Singer $49,600. *Id.* ¶¶ 275–78.

Cellucci further alleges, in similarly conclusory terms, that DarkPulse's former chief financial officer, Stephen Goodman, assigned his claim for breach of contract, for $45,200 in unpaid compensation, to Cellucci. *Id.* ¶ 273–74. The FAC does not provide the terms of Goodman's employment agreement or the specifics of the purported assignment agreement between Goodman and Cellucci.

### H. DarkPulse's Alleged Retaliation Against Singer

On March 7, 2019, Singer allegedly filed a complaint with the SEC concerning O'Leary's conduct. *Id.* ¶ 282. The FAC does not allege what Singer reported to the SEC, except to state in conclusory terms that Singer "reasonably believed that the Defendants were engaging in conduct that was in violation of Sarbanes Oxley, Dodd-Frank and U.S. Securities Laws." *Id.* ¶ 284. The FAC further states, in boilerplate terms, that Singer acted in good faith as a whistleblower and that Defendants retaliated against Singer for engaging in protected conduct by terminating his employment. *Id.* ¶¶ 285–89.

\*     \*     \*

Plaintiffs bring an array of claims under Delaware law, primarily for breaches of fiduciary duty and DarkPulse's charter and by-laws; Singer also raises a federal claim for

whistleblower retaliation under the Dodd-Frank Act.  Defendants DarkPulse and O'Leary have moved to dismiss on multiple grounds, including for lack of derivative standing and failure to state a claim.

## II.  DISCUSSION

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  At the Rule 12(b)(6) stage, the Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  That presumption of truth "is inapplicable to legal conclusions," however.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Before turning to the sufficiency of Plaintiffs' amended complaint, some housekeeping is in order.  Although Plaintiffs purport to raise fourteen causes of action, the first nine of which are derivative in nature, many of the "causes of action" are duplicative and vary only in the remedy being sought.  *See generally* FAC (Dkt. 64) at 32–59.  Several of the claims are also a confused doctrinal thicket, in that they invoke multiple theories within one cause of action, including by conflating and fusing together legal and equitable principles.  For instance, the first "cause of action," brought derivatively, simultaneously alleges breaches of the corporate charter, by-laws, and SEC rules and regulations and breaches of fiduciary duties (of loyalty, good faith, disclosure, and fair dealing);[3] it seeks equitable relief (removal of O'Leary as a director) and legal relief

---

[3]     The fusing of breaches of fiduciary duty with breaches of the by-laws and the certificate of incorporation erases a core distinction between legal and equitable claims under Delaware law.  *See Hollinger Int'l, Inc. v. Black*,

(money damages in favor of the company). *Id.* at 54 & ¶¶ 139–40. The second "cause of action," also brought derivatively, repeats those exact theories for relief but seeks the removal of O'Leary as an officer;[4] it also seeks both legal and equitable relief. *See id.* at 54–55 & ¶¶ 152–53, 155. The third "cause of action" raises, again derivatively, "misappropriation, misuse, conversion, and/or wasting of corporate assets," without explaining the differences or committing to any particular theory; it seeks equitable and legal relief. *See id.* at 34 & ¶¶ 167–68. The fourth "cause of action," brought derivatively, is a combo pack of breach of fiduciary duty and waste; it also seeks legal and equitable relief. *See id.* ¶¶ 176–77. Although the third and fourth causes of action both seek an accounting as a remedy, Plaintiffs' eighth "cause of action" is a standalone claim for an accounting, based on a combo theory of breach of fiduciary duty and waste. *Id.* ¶¶ 230–31. Plaintiffs' ninth "cause of action" is simply titled "Award of Legal Fees and Expenses."[5] *Id.* at 46. The tenth and fourteenth causes of action are individual claims that are identical to Plaintiffs' derivative claims, *id.* ¶¶ 254–58, 292–93, even though the law is quite clear that Plaintiffs may not maintain an individual action unless they have suffered an injury that is separate from that suffered by the corporation and all other shareholders. *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del. 1988). In short, the structure of the

---

844 A.2d 1022, 1077–78 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005) ("In general, there are two types of corporate law claims. The first is a legal claim, grounded in the argument that corporate action is improper because it violates a statute, the certificate of incorporation, a bylaw or other governing instrument, such as a contract. The second is an equitable claim, founded on the premise that the directors or officers have breached an equitable duty that they owe to the corporation and its stockholders.").

[4]     The Court further notes that Plaintiffs' request for relief at the end of the amended complaint is not fully consistent with the relief sought in the paragraphs setting forth each cause of action. *Compare* FAC (Dkt. 64) at 54–55 (requesting accounting pursuant to first three causes of action) *with id.* ¶¶ 145–49 (omitting any reference to accounting), 155–57 (same).

[5]     Causes of action five, six, and eleven were voluntarily dismissed. Dkts. 93–94.

amended complaint has no rhyme or reason, blurs the distinction between a cause of action and a remedy, and ignores basic principles of corporate law.

For purposes of clarity, the Court construes the amended complaint as attempting to raise the following derivative claims: (1) a breach of duty of care based on alleged disregard of export controls; (2) a breach of duty of care based on alleged misuse of social media and other communications; (3) a breach of duty of loyalty based on alleged diversion of corporate assets to DarkPulse East and DPTI-DE; and (4) a breach of duty of care based on chronic mismanagement, such as being late to meetings or making unnecessary expenditures. The Court also construes the amended complaint to raise the following individual claims against DarkPulse[6]: (1) a breach of the certificate of incorporation and by-laws by ousting Plaintiffs without the majority vote of a duly constituted board of directors or qualified successors; (2) a breach of the corporate charter or by-laws for failure to consult officers before retaining new counsel; (3) a breach of employment contracts for failure to pay compensation; and (4) retaliation under the Dodd-Frank Act as to Singer only.

### A. Plaintiffs' Derivative Claims

Given how muddled this complaint is, it is worth reviewing basic principles that govern derivative litigation. A derivative action is an action maintained by a shareholder on behalf of the corporation. *Kramer*, 546 A.2d at 351. To bring such an action in federal court, the shareholder plaintiff must satisfy the requirements set forth in Rule 23.1 of the Federal Rules of Civil Procedure. That is:

The complaint must be verified and must:

---

[6] The Court presumes that the relevant actor for purposes of the individual claims is DarkPulse, although the amended complaint does not make clear the party from whom relief is sought. Any further amended pleading must specify the defendant(s) as to each claim.

(1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law;

(2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and

(3) state with particularity:

(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and

(B) the reasons for not obtaining the action or not making the effort.

Fed. R. Civ. P. 23.1(b).

Here, Plaintiffs do not appear to have made a good-faith attempt to comply with any of those requirements. First, neither the complaint nor the amended complaint is a verified pleading—both were signed only by Plaintiffs' counsel. *See* Dkts. 1, 64. Ordinarily, the failure to verify the pleading is not an adequate basis to dismiss, but Plaintiffs have also failed to satisfy the other requirements under Rule 23.1. *See Markowitz v. Brody*, 90 F.R.D. 542, 549–50 (S.D.N.Y. 1981). While the amended complaint gestures half-heartedly in the direction of the contemporaneous ownership requirement, Plaintiffs do nothing except copy and paste the language of Rule 23.1(b)(1). *See, e.g.*, FAC (Dkt. 64) at 5 ("Dr. Cellucci was a shareholder of DarkPulse at the time of the transactions that are the subject of the Complaint and/or his stock thereafter devolved upon him by operation of law."). There are no factual allegations underlying that legal conclusion, as the amended complaint is silent as to when each of the four Plaintiffs first acquired DarkPulse stock—facts that should be easily within their personal knowledge or at least readily ascertainable—*and* almost no allegations as to when the relevant conduct underlying their derivative claims occurred. Those omissions, combined with the failure to verify the allegations in the Complaint, give the Court no confidence that this action was not

brought for purpose of harassment, a scenario that Rule 23.1 seeks to prevent.  *See Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 793 (S.D.N.Y. 2011).

To make matters worse, there is no allegation relevant to non-collusion, and there is also reason to doubt Plaintiffs' allegations as to demand futility.  *See* Fed. R. Civ. P. 23.1(b)(2)–(3). Plaintiff alleges that demanding that DarkPulse pursue these claims directly would be futile because O'Leary is the sole director of the board, and he is not disinterested given the nature of these allegations.  FAC (Dkt. 64) ¶ 129.  In response, Defendants contend in their motion papers that there is now a three-member board of directors.  Def. Br. (Dkt. 72) at 18.  While the Court may not credit Defendants' factual assertion at this stage, as it is beyond the face of the amended complaint, Plaintiffs appear to concede in their briefing that Defendants' contention, which was first disclosed to them at a hearing before this Court[7] prior to the filing of the amended complaint, is correct.  *See* Pl. Br. (Dkt. 78) at 10 (arguing that O'Leary "only permitted, at most, 2 persons to be elected as directors *as of the time this action was first filed*" (emphasis added)). Plaintiffs, however, make no effort to argue why a demand upon DarkPulse would still have been futile at the time the amended complaint was filed (because it appears O'Leary was no longer the sole director of the board), or why futility should be assessed at the time of the original filing, rather than at the time of the amendment.  *See Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) ("Three circumstances must exist to excuse a plaintiff from making demand under Rule 23.1 when a complaint is amended after a new board of directors is in place . . . . "). At minimum, Plaintiffs do not appear to have made any effort to confirm the membership of the

---

[7]      *See* Hearing Tr. (Dkt. 71-2) at 9.

DarkPulse board, information that should be easily accessible given DarkPulse's status as a publicly held company.[8]

Because Plaintiffs' pleading fails to comply with any aspect of Rule 23.1(b), all of Plaintiffs' derivative claims are dismissed. The Court, however, grants leave to file a second amended complaint because it may be possible for Plaintiffs to overcome the identified defects.

### B. Plaintiffs' Individual Claims

As explained below, Plaintiffs have failed to state any individual claims.

#### 1. Improper Removal as Officer or Director

DarkPulse's officers may be removed "at any time by the affirmative vote of a majority of the board of directors." FAC (Dkt. 64) ¶ 59; DarkPulse By-Laws (Dkt. 64-1), Art. V, Sec. 5. The board of directors, according to DarkPulse's charter, must consist of at least three directors. FAC (Dkt. 64) ¶¶ 49–50; DarkPulse Charter (Dkt. 64-1), Art. X. "[A]ny director or the entire board of directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors." DarkPulse Charter (Dkt. 64-1), Art. III, Sec. 15. Plaintiffs' theory is that they were all improperly removed as officers because DarkPulse had only one or two directors at the time of their termination and because their successors had not yet been identified, FAC (Dkt. 64) ¶¶ 16, 51, 59; Cellucci further claims that he was unlawfully ousted as a director, without explaining why that ouster was improper. *See, e.g.*, *id.* ¶¶ 1, 3, 57, 148.

As a threshold matter, Plaintiffs have not established that they may appropriately pursue, in this forum, any claim of invalid removal as an officer or director of a Delaware corporation.

---

[8]  The Court notes that on April 23, 2019, the company filed on Form 8-K an announcement that Dr. Anthony Brown and Carl Eckel had been appointed directors as of April 17, 2019. *See* DarkPulse, Inc., Current Report (Form 8-K) (April 23, 2019), *available at* https://www.sec.gov/Archives/edgar/data/866439/000168316819001170/ darkpulse_8k.htm.

Neither side has cited any case that involves an ousted officer or director attempting to enforce a bylaw that was breached by his or her removal. To the extent that the Court has found such cases under Delaware law, they have taken the form of a Section 225 proceeding, which is ordinarily commenced in the Court of Chancery of Delaware. *See* 8 Del. C. § 225(a) ("Upon application of any stockholder or director, or any officer whose title to office is contested, the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office."); *e.g.*, *Essential Enterprises Corp. v. Automatic Steel Prods., Inc.*, 164 A.2d 437, 439 (Del. Ch. 1960) (concluding that improperly removed director was entitled to interim compensation between time of removal and later ratification); *Gorman v. Salamone*, No. 10183, 2015 WL 4719681, at *6 (Del. Ch. July 31, 2015) (invalidating removal of CEO); *Gassis v. Corkery*, No. 8868, 2014 WL 2200319, at *13 (Del. Ch. May 28, 2014) (concluding that bylaws permitted plaintiff's removal as director), *aff'd*, 113 A.3d 1080 (Del. 2015); *Unanue v. Unanue*, No. 204, 2004 WL 2521292, at *14 (Del. Ch. Nov. 3, 2004) (concluding that removal of director was valid and protected by business judgment rule); *Stellini v. Oratorio*, No. 5780, 1979 WL 2703, at *1–2 (Del. Ch. Sept. 5, 1979) (concluding that reinstatement of plaintiffs as officers and directors was unwarranted).

The Court has not found any instance of a federal court, anywhere in the country, granting relief pursuant to Section 225, and Plaintiffs have not explained why this Court, rather than the Chancery Court, should determine who are the rightful officers and directors of DarkPulse.[9] *See Dillon v. Berg*, 347 F. Supp. 517, 520 n.3 (D. Del. 1972) (holding that, even if plaintiffs' allegations had merit, "the appropriate forum is the Delaware Court of Chancery,

---

[9] In fairness to Plaintiffs, inexplicably, Defendants did not raise this as an issue in their motion to dismiss.

which by statute is conferred with full powers to act in disputes of the kind raised here"). Nor has the Court found any example of a court in this circuit granting the relief that Plaintiffs seek—reinstatement and damages—in a case involving a Delaware corporation, pursuant to Section 225 or not.[10] Because a Section 225 action appears to be Plaintiffs' exclusive remedy under Delaware law and Plaintiffs have not purported to assert such a claim, their individual claims for breach of DarkPulse's governing documents are dismissed.

To the extent that Plaintiffs intend to bring a Section 225 claim in this Court, they must file a letter motion seeking leave to amend, explaining why such a claim should not be brought in Delaware Chancery Court. Furthermore, even assuming that this Court can and should entertain a Section 225 claim, because such a proceeding is designed to be a speedy and narrowly tailored mechanism to determine corporate leadership, Plaintiffs must explain why their other claims should not be dismissed as collateral to the proceeding. *See Box v. Box*, 697 A.2d 395, 398 (Del. 1997) ("The purpose of section 225 is to provide a quick method for review of the corporate election process to prevent a Delaware corporation from being immobilized by controversies about whether a given officer or director is properly holding office."); *Nevins v. Bryan*, 885 A.2d 233, 244 n.34 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005) ("[T]his case was brought under § 225 and, as such, its scope is limited to arguments regarding the validity of actions to elect or remove a director, officer or member.").

---

[10]     Despite the apparent practice of deferring to Delaware courts in such cases, Section 225's instruction that board and officer disputes be filed in the Chancery Court does not deprive federal courts of subject-matter jurisdiction. *See Chicago & N.W.R. Co. v. Whitton*, 80 U.S. 270, 286 (1871) ("Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such case, is not subject to State limitation."); *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 n.3 (2d Cir. 1982) ("[T]here would be substantial doubt as to the constitutionality of a state law purporting to preclude federal court diversity or pendent jurisdiction over a state-created claim . . . . That rule does not require a federal diversity court to exercise its jurisdiction if the courts of the forum state would not interfere in a dispute properly cognizable in a foreign forum.").

## 2. Retaining New Counsel Without Consultation of Officers

Although Plaintiffs contend that Defendants retained new counsel without consulting DarkPulse's officers, they have cited no provision of the charter or bylaws that requires such consultation. The Court will not scour the record to build Plaintiffs' case. Thus, to the extent Plaintiffs are claiming a breach of any bylaw or charter provision based on Defendants' decision to retain new counsel, that claim is dismissed, with leave to amend.

## 3. Breach of Employment Contracts

Plaintiffs' allegations of breach of contract are entirely conclusory—and so much so that the Court cannot even be certain which jurisdiction's substantive law controls.[11] Fortunately, because the allegations are wholly unsupported by factual allegations, they are inadequate whether under Delaware, New York, or likely any other jurisdiction's law of contracts making a detailed conflicts-of-law analysis unnecessary. Under Delaware law, "[i]n order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). Under New York law, "[t]he elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance under the contract, the defendant's breach, and resulting

---

[11] Because any failure to pay Plaintiffs' salaries does not arise from the same facts as the only federal claim in this case (whistleblower retaliation against Singer), the Court sits in diversity as to the contract claims. Accordingly, the Court must apply the choice-of-law rules in New York, the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). In contract cases, the Court must perform a "grouping of contacts" analysis, which includes examining "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 383 (2d Cir. 2006) (citing *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 227 (1993)). All of those details as to the alleged contracts are missing—except DarkPulse's principal place of business (New York), and Plaintiffs' domiciles around the country; there is no allegation as to Goodman's domicile, even though Cellucci is asserting Goodman's breach of contract claim, which has reportedly been assigned to Cellucci.

damages." *Detringo v. S. Island Family Med., LLC*, 158 A.D.3d 609, 609 (2d Dep't 2018).  The existence of a contract hinges on "offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."  *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (1st Dep't 2009).  As discussed previously, a plaintiff cannot satisfy his or her pleading obligations by making only conclusory allegations.  *Iqbal*, 556 U.S. at 678.

Plaintiffs attempt to assert breaches of four employment contracts, one of which hinges on the terms of a separate assignment between a non-party (Goodman) and Cellucci.  Plaintiffs fail, however, to allege any non-conclusory facts concerning any of the five alleged agreements.  First, although Plaintiffs claim that Defendants owe them compensation of various amounts, none of the terms of the agreements is alleged in the FAC.  *See, e.g.*, FAC (Dkt. 64) ¶¶ 271–72 ("DarkPulse had entered into an agreement with Dr. Cellucci to compensate him for his services in an agreed upon manner.").  Plaintiffs also allege, in conclusory terms, that they each performed under his respective agreement, without specifying the performances required under the contract.  *See, e.g.*, *id.* ("Dr. Cellucci provided the services required under the agreement but did not receive all of the compensation required by the agreement.").  Cellucci further claims that Defendants owe DarkPulse's former chief financial officer, Stephen Goodman, $45,200 in compensation, a claim that Goodman has purportedly assigned to Cellucci.  *Id.* ¶ 274 ("For good and valuable consideration, Mr. Goodman assigned his claim to Dr. Cellucci.").  The FAC does not provide the terms of Goodman's employment contract or the terms of the assignment agreement, and it does not allege whether the contracts are oral or written.  Despite asserting the existence of five different contracts, Plaintiffs have not put forth a single allegation as to the compensation provided for under the agreements or as to how Plaintiffs calculated the allegedly

18

unpaid amounts.  Indeed, the factual allegations are so sparse that the Court cannot conclude that any contract actually exists, let alone that it was breached.

Plaintiffs could have alleged the terms of the five contracts at issue, attached copies of those agreements (if they were written), or even summarized the essential terms with some specificity—they have done none of those things.[12]  *See Comfort Inn Oceanside v. Hertz Corp.*, No. 11-CV-1534, 2011 WL 5238658, at *6 (E.D.N.Y. Nov. 1, 2011) ("[A] claim on a written contract must either (1) quote relevant contractual language; (2) include a copy of the contract as an attachment; or (3) summarize the contract's purported legal effect." (citation omitted)); *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05-CV-4837, 2006 WL 399396, at *10 (S.D.N.Y. Feb. 21, 2006) ("The complaint must set forth the terms of the agreement upon which liability is predicated, either by express reference or by attaching a copy of the contract." (citation omitted)); *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, No. 3099, 2009 WL 264088, at *4 (Del. Ch. Feb. 3, 2009) ("To survive a motion to dismiss, [Plaintiff] must plead facts demonstrating: (1) the intent of the parties to be bound to (2) sufficiently definite terms supported by (3) consideration.").  In short, Plaintiffs' claims for unpaid compensation are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," precisely what federal courts ought not to accept.  *See Ashcroft*, 556 U.S. at 678.

Cellucci opposes dismissal by asking for a return to the notice-pleading standard that the Supreme Court definitively rejected more than a decade ago in *Ashcroft v. Iqbal*.  To make his

---

[12]     If the contracts were oral or implied, then Plaintiffs have the same (or potentially higher) burden to plead the facts surrounding the formation of the contracts and the circumstances from which the terms may be inferred. *See Comfort Inn Oceanside v. Hertz Corp.*, No. 11-CV-1534, 2011 WL 5238658, at *6 n.9 (E.D.N.Y. Nov. 1, 2011) (citing 5 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1235, at 393 (3d ed. 2004) and *Am. Realty Tr., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 362 F. Supp. 2d 744, 753 (N.D. Tex. 2005)).

point, Plaintiffs' counsel invokes a fillable form designed to assist *pro se* litigants, effectively arguing that he has satisfied the pleading standard required of uncounseled parties. Pl. Br. (Dkt. 78) at 23. First, it bears mentioning that Plaintiffs' counsel is not relying on form pleadings from the Federal Rules of Civil Procedure, which had legal effect until the abrogation of Rule 84 in 2015. Fed. R. Civ. P. 84, 2015 Amendment; *see, e.g.*, *Comfort Inn Oceanside*, 2011 WL 5238658, at *8 n.11 (discussing relationship between form pleadings and plausibility pleading). Reliance on those forms would have been untimely but understandable. Instead, Plaintiffs' counsel is pointing to *pro se* self-help materials, which, as should be obvious, have no precedential or other legal effect.[13] Furthermore, the Court sees nothing in the *pro se* form that suggests that a plaintiff need not plead, or at least describe, the terms of a contract at issue in a complaint. Finally, as much as Plaintiffs' counsel may desire less scrutiny, Plaintiffs, as counseled parties, are not entitled to receive liberal construction of their arguments and pleadings. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (citation omitted)).

Because Plaintiffs have not adequately alleged the terms of the contracts that Defendants purportedly breached or adequately pleaded Cellucci's standing to assert Goodman's claim, Defendants' motion to dismiss is granted. As with the other dismissed claims, the Court grants leave for Plaintiffs to amend their pleading for the second time in this litigation.[14]

---

[13]     To the extent that there is any unexpected ambiguity that self-help materials on the judiciary's website lack force of law, the webpage makes clear that "[f]ollowing a form does not guarantee that any pleading is legally or factually correct or sufficient," and that "[n]o form provides legal advice." United States Courts, *Complaint for a Civil Case Alleging Breach of Contract, Pro Se Form 4* (December 1, 2016), *available at* https://www.uscourts.gov/forms/pro-se-forms/complaint-civil-case-alleging-breach-contract.

[14]     The Court further notes that each alleged breach of contract (and Singer's retaliation claim) appears to involve its own set of facts. To the extent that Plaintiffs intend to proceed with those claims, they must carefully consider whether such claims are properly joined if they file an amended pleading. *See* Fed. R. Civ. P. 18, 20.

4. Retaliation Against Singer

Section 922 of the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 contains an anti-retaliation provision. *See* 15 U.S.C. § 78u–6(h). Specifically, it prohibits an employer from "discharge[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], directly or indirectly, or in any other manner discriminat[ing] against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower," including for "providing information to the [SEC] in accordance with this section," or " making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 *et seq.*), this chapter, including section 78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission." *Id.* Singer alleges that he was discharged on March 19, 2019, in retaliation for a complaint he had filed with the SEC twelve days before, on March 7, 2019. FAC (Dkt. 64) ¶¶ 282–83. Defendants argue that Singer has failed to plead that he was engaged in protected activity and that Defendants were aware of the SEC complaint at the time of termination. *See* Defs. Br. (Dkt. 72) at 22–23. The Court agrees.

To state a claim for retaliation, a plaintiff must allege facts showing "(1) that the plaintiff engaged in a protected activity, (2) that the plaintiff suffered an adverse employment action, and (3) that the adverse action was causally connected to the protected activity." *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12-CV-8433, 2017 WL 3278917, at *10 (S.D.N.Y. Aug. 1, 2017); *Ott v. Fred Alger Mgmt., Inc.*, No. 11-CV-4418, 2012 WL 4767200, at *4 (S.D.N.Y. Sept. 27, 2012). To have been engaged in protected activity, the plaintiff must have "had an objectively reasonable belief that the defendant's [reported] conduct violated one of the enumerated provisions of law." *Lawrence*, 2017 WL 3278917, at *10 (citing *Nielsen v. AECOM Tech.*

*Corp.*, 762 F.3d 214, 222 (2d Cir. 2014)).  While a plaintiff need not show that a defendant

actually violated the law, the alleged belief that a defendant engaged in unlawful activity must

not be wholly untethered to the elements of the law believed to have been violated.  *Id.*

Furthermore, a causal connection is absent in a retaliation case if the decision-maker was

unaware of the plaintiff's protected activity at the time the adverse employment action was

taken.  *Feldman-Boland v. Stanley*, No. 15-CV-6698, 2016 WL 3826285, at *4 (S.D.N.Y. July

13, 2016).

Singer has failed to allege that he was engaged in protected activity and that Defendants

were aware of his protected activity.  First, the amended complaint contains no allegation as to

the contents of Singer's complaint—accordingly, the Court has no way to assess whether he was

complaining of conduct that is even arguably within the scope of the Dodd-Frank whistleblower

provision and no way to assess whether Singer could have had a reasonable belief that the

reported conduct was unlawful.  Not only are the relevant allegations wholly untethered from the

elements of any particular violation, the amended complaint does not even identify a specific

provision or section that may have been violated.  *See* FAC (Dkt. 64) ¶¶ 284, 287 ("Mr. Singer

reasonably believed that the Defendants were engaging in conduct that was in violation of

Sarbanes Oxley, Dodd-Frank and U.S. Securities Laws.") ("Mr. Singer made protected

disclosures of violations of statutes under the purview of the U.S. Securities and Exchange

Commission.").  Singer instead asks the Court to infer that his report to the SEC encompassed

every allegedly improper communication or omission cited in the amended complaint.  Pl. Br.

(Dkt. 78) at 23.  That is not a plausible inference because the amended complaint does not even

allege Singer's personal knowledge of those communications or omissions.  The Court finds

Plaintiffs' reticence to include at least some factual detail in the amended complaint exceptionally curious, as Singer should know well the contents of his own complaint.

Singer has also failed to plausibly plead any facts from which the Court can infer that Defendants knew about the SEC complaint. Singer does not allege that he communicated his concerns to anyone or any entity other than the SEC. The SEC is in turn obligated to maintain the confidentiality of all reports, unless disclosure is required by the commencement of an enforcement action or the Freedom of Information Act. *See* 15 U.S.C. § 78u–6(h)(2). Singer does not allege that any investigative action was taken against Defendants prior to his termination or any other circumstance that could plausibly explain how Defendants could have learned about Singer's confidential report within approximately a week of it being filed. *Cf. Feldman-Boland*, 2016 WL 3826285, at *4 (holding that knowledge could be inferred based on commencement of audit one month after plaintiff's report to SEC). In opposition to the motion to dismiss, Singer argues that his allegation of "retaliation" contains an implicit allegation of knowledge. Pl. Br. (Dkt. 78) at 24. Plaintiff again displays no awareness of the pleading standard utilized by federal courts today—his complaint would fail even if he had alleged in conclusory fashion that Defendants "knew" about the SEC complaint. *See Nielsen*, 762 F.3d at 224 (rejecting retaliation claim premised on "trivial and conclusory" allegations).

Because Singer has failed to allege two of the three elements of a retaliation claim, Defendants' motion to dismiss Singer's claim for a violation of Section 922 of the Dodd-Frank Act is granted. Because the Court is already granting leave to file an amended complaint, Singer shall have one last chance to plead a plausible claim.

# III.    CONCLUSION

For the foregoing reasons, all derivative claims in the amended complaint are dismissed for failure to comply with Rule 23.1 of the Federal Rules of Civil Procedure.  All individual claims are dismissed for failure to state a claim.

Plaintiffs are given leave to file a second amended complaint that is consistent with this opinion, no later than **March 20, 2020**.  The second amended complaint must clearly set forth each cause of action without blurring legal theories, distinguish between causes of action and remedies, avoid asserting duplicative causes of action, and comply with the requirements of Rule 23.1, including by setting forth dates of Plaintiffs' stock ownership and Defendants' alleged misconduct.  Plaintiffs may not re-file any individual action that asserts a generalized injury shared by all shareholders, which must be brought solely as a derivative claim under Delaware law.  Furthermore, Plaintiffs must take reasonable steps to ascertain the current composition of DarkPulse's board of directors, and, to the extent that the third amended complaint continues to assert derivative claims, address demand futility in light of the current board.  To the extent that subject-matter jurisdiction in the second amended complaint will be premised on diversity jurisdiction, Plaintiffs, taking appropriate consideration of the rules on joinder, must allege specific facts showing that the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332. Finally, Plaintiffs must ensure that the relief requested in the pleading, for each cause of action, is consistent throughout.  Failure to comply with this order may result in a dismissal pursuant to Rule 41(b).

To proceed with their individual claims stemming from their termination as an officer or director, Plaintiffs must file, no later than **March 13, 2020**, a letter motion addressing the issues

raised in Section II.B.1.  If Plaintiffs file such a letter motion, Defendants must respond not later than **March 27, 2020**.

The Clerk of Court is respectfully requested to terminate the pending motion at docket entry 70.


**SO ORDERED.**

**Date:  February 28, 2020**
       **New York, New York**                          **VALERIE CAPRONI**
                                                       **United States District Judge**