## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------x
THE HON., THOMAS A. CELLUCCI, PhD, MBA;      :
STEPHEN GOODMAN, MBA, ESQ.; DAVID D.         :
SINGER, MARK A BANASH, PhD, MBA              :    CIVIL ACTION NO.:
and ROBERT ALLAN CAMPBELL, MBA, Each One     :    19-CV-02752 (VEC)
Individually and Derivatively on behalf of   :
DARKPULSE, INC.,                             :
                                             :    VERIFIED SECOND
                          Plaintiffs,        :    AMENDED COMPLAINT
                                             :
                                             :
        - against -                          :
                                             :
                                             :
DENNIS MICHAEL O'LEARY, Individually and     :
as Officer and Director of DARKPULSE, INC.;  :
DARKPULSE, INC.,                             :
                                             :
                          Defendants.        :
---------------------------------------------------------------x
```

Plaintiffs, The Hon., Thomas A. Cellucci, PhD, MBA, Mr. Stephen Goodman, MBA, Esq.,

David D. Singer, Mark A. Banash, PhD, MBA, and Robert Allan Campbell, MBA, both in their

individual capacities and derivatively on behalf of DarkPulse, Inc., a Delaware corporation

(collectively "Plaintiffs"), by way of Verified Second Amended Complaint ("Complaint") against

Defendants Dennis Michael O'Leary ("O'Leary"), both in his individual capacity and as Officer

and Director of DarkPulse, Inc., DarkPulse, Inc. ("DarkPulse") who is named as a nominal

Defendant, (collectively referred to as "Defendants") state as follows:

### INTRODUCTION

1.      Plaintiffs bring this action to protect their individual rights as minority

shareholders, as improperly-ousted Officers (except Mr. Campbell who was not an Officer at the

time), and in Dr. Cellucci's case, as an improperly-ousted Director as well, pursuant to their

common law rights as shareholders, improperly-ousted Officers (except for Mr. Campbell who

was not an Officer at the time), and further in Dr. Cellucci's case, as an improperly-ousted Director as well.

2.     In their action, Plaintiffs bring this action to recover damages on behalf of DarkPulse and on behalf of the Plaintiffs in their own right from Mr. O'Leary's breach of his fiduciary duty, misappropriation, conversion and wasting of corporate assets, and violations of Delaware General Corporate Law ("DGCL") § 141(a).

3.     Plaintiffs also seek recovery of salaries not paid.  Plaintiffs further seek punitive damages for the wanton conduct of Mr. O'Leary's gross breaches of fiduciary duty, blatant disregard of the corporate form, and/or the severe wasting and/or misappropriation of corporate assets.  Finally, Plaintiffs seek recovery for their attorneys' fees and costs.

4.     As more specifically described in the paragraphs of this Complaint below, Mr. O'Leary, the Chief Executive Officer, majority shareholder, and acting as the self-designated sole member of the Board of Directors, took control of the management of DarkPulse, and has taken and continues to take actions that have harmed and continue to harm DarkPulse and its shareholders, depriving Plaintiffs and DarkPulse's other minority shareholders of their rights and interests in DarkPulse in violation of Delaware law.

5.     Mr. O'Leary's malfeasances include, but are not limited to: (i) failing to follow Delaware law and DarkPulse's certificate of incorporation and bylaws by maintaining less than three Board of Director members (and indeed by unilaterally and improperly terminating Dr. Cellucci as the second of two Board members, leaving Mr. O'Leary as the sole Director); (ii) committing illegal and oppressive actions toward Plaintiffs and other shareholders of DarkPulse; (iii) wasting, impairing, and/or improperly diverting the assets of DarkPulse for Mr. O'Leary's personal benefit; and (iv) misstating, misreporting, and non-reporting of events required to be

accurate (both with the Securities and Exchange Commission ("SEC") and on social media) in violation of SEC and Delaware State statutes, rules and regulations.

## JURISDICTION

6.    This Court has jurisdiction over all counts pursuant to 28 U.S.C. § 1332 where the amount in controversy in the present action exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interests and costs, and where there exists complete diversity of citizenship.

7.    This Court has jurisdiction over each of the Defendants because each maintains an address in and regularly conducts business in the State of New York.

8.    Complete diversity exists between the parties, as identified in the "Parties" section below.

9.    This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

## VENUE

10.    Venue is proper in the District of New York pursuant to 28 U.S.C. § 1391(a) because at all relevant times the operative transaction and acts of the parties occurred while each of the Defendants maintained residences in New York County.

11.    This Court has jurisdiction over each of the Defendants because each maintains an address in and regularly conducts business in the State of New York.

## PARTIES

### A.  Plaintiff, The Hon., Thomas A. Cellucci, PhD, MBA

12.    Plaintiff, The Hon., Thomas A. Cellucci, PhD, MBA is an individual residing in Chantilly, Virginia.  In or about late January 2018, Dr. Cellucci was appointed to serve and began serving as a Director for DarkPulse's Board of Directors.  In or about early February 2018, Dr.

Cellucci was appointed and began to serve as the co-Chief Executive Officer of DarkPulse.  In February 2019, Mr. O'Leary removed Dr. Cellucci as both a Director and as the co-Chief Executive Officer without any expressed reason or basis.

13.     Among Dr. Cellucci's many accomplishments, he served as the United States' first Chief Commercialization Officer at the US Department of Homeland Security, as well as served in The White House under both the George W. Bush and Barack H. Obama administrations.  Dr. Cellucci received an undergraduate degree from Fordham University, a doctorate from the University of Pennsylvania, and an MBA from Rutgers State University of New Jersey.  He is the author or co-author of over 20 books and hundreds of technical and/or business articles.  Dr. Cellucci continues to hold the highest levels of security clearance from the US Government (Presidential Yankee White) and Military (Authority to Operate), with vast Board (public and private) experience across the globe.

14.     On or about April 27, 2018, Dr. Cellucci acquired 54,816,142 shares of DarkPulse's Common Stock (representing 37.67% of the outstanding Common Stock), and a total equivalent of voting of all Equity Shares of 56,472,000, representing a 9.34% voting power.  Dr. Cellucci has continued to be a shareholder of the above-refenced shares in DarkPulse at the time of the transactions that are the subject of this Complaint, as well as the date of this Complaint.

**B.  Plaintiff, Stephen Goodman, MBA, Esq.**

15.     Plaintiff, Stephen Goodman, MBA, Esq., is an individual residing in Anthem, Arizona.  Mr. Goodman was appointed and began to serve as DarkPulse's Chief Financial Officer on or about April 11, 2018.  On or about March 8, 2019, he was terminated from that position without any expressed reason or basis.

16.     Mr. Goodman has over four decades of experience in the management and treasury function of both private and publicly owned companies. Mr. Goodman received an undergraduate degree from The Wharton School of the University of Pennsylvania, an MBA degree "with distinction" from New York University, and a J.D. from William Howard Taft University.

17.     On or about April 27, 2018, Mr. Goodman acquired 6,854,930 shares of DarkPulse's Common Stock (representing 7.03% of the outstanding Common Stock), and a total equivalent of voting of all Equity Shares of 7,062,000, representing a 1.18% voting power. Mr. Goodman has continued to be a shareholder of the above-refenced shares in DarkPulse at the time of the transactions that are the subject of this Complaint, as well as the date of this Complaint.

**C. Plaintiff, David D. Singer**

18.     Plaintiff, David D. Singer is an individual residing in Aurora, Colorado. Mr. Singer was appointed and began to serve as DarkPulse's Chief Marketing Officer on or about April 2, 2018. On or about March 19, 2019, he was terminated from that position without any expressed reason or basis.

19.     Mr. Singer has over four decades of experience working with both national and international companies developing business relationships and expanding new and existing business opportunities. He has served as the Chairman, CEO and President of an American Stock Exchange company, and held various positions in OTC companies for over twenty years. In these capacities, he has worked with a number of companies including Ford Motor, Panasonic, The Williams Companies, Walt Disney, and Siemens.

20.     On or about April 27, 2018, Mr. Singer acquired 6,854,930 shares of DarkPulse's Common Stock (representing 7.03% of the outstanding Common Stock), and a total equivalent of voting of all Equity Shares of 7,062,000, representing a 1.18% voting power. Mr. Singer has

continued to be a shareholder of the above-refenced shares in DarkPulse at the time of the transactions that are the subject of this Complaint, as well as the date of this Complaint.

**D.  Plaintiff, Mark A. Banash, PhD, MBA**

21.     Plaintiff, Mark A. Banash, PhD, MBA is an individual residing in Bedford, New Hampshire.  On or about February 15, 2018, Dr. Banash was appointed and began to serve as DarkPulse's Chief Technology Officer.  On or about March 18, 2019, he was terminated from that position without any expressed reason or basis.

22.     Dr. Banash has almost 30 years of experience in bringing advanced technology from the laboratory to the marketplace.  His experience includes having worked with ISO and NIST on metrology and quality standards related to new technologies.  With respect to DarkPulse, he had worked on transitioning the technology from prototype to a manufacturable design.  Dr. Banash received a doctorate from Princeton University, an undergraduate degree with honors from the University of Pennsylvania, and an MBA from the University of Maryland University College.

23.     On or about April 27, 2018, Dr. Banash acquired 6,854,930 shares of DarkPulse's Common Stock (representing 7.03% of the outstanding Common Stock), and a total equivalent of voting of all Equity Shares of 7,062,000, representing a 1.18% voting power.  Dr. Banash has continued to be a shareholder of the above-refenced shares in DarkPulse at the time of the transactions that are the subject of this Complaint, as well as the date of this Complaint.

**E.  Plaintiff, Robert Allan Campbell, MBA**

24.     Plaintiff, Robert Allan Campbell, MBA, is an individual residing in El Cajon, California.  Mr. Campbell was a Chief Operating & Financial Officer for Klever Marketing, Inc.

Klever Marketing, Inc. merged into a "Merger Subsidiary" of DarkPulse, and ultimately merged with DarkPulse

25.     Mr. Campbell earned an MBA from UCLA Anderson School of Management.

26.     Mr. Campbell was a pre-existing shareholder of Klever Marketing Inc. who acquired his shares in that company on or about October 31, 1990.  On or about April 27, 2018, Mr. Campbell shares in Klever Marketing Inc. were converted to 6,854,930 of DarkPulse's Common Stock (representing 7.03% of the outstanding Common Stock), and a total equivalent of voting of all Equity Shares of 7,062,000, representing a 1.18% voting power.  Mr. Campbell has continued to be a shareholder of the above-refenced shares in DarkPulse at the time of the transactions that are the subject of this Complaint, as well as the date of this Complaint.

### F.  Nominal Defendant DarkPulse, Inc.

27.     Nominal Defendant, DarkPulse, Inc. (f/k/a Klever Marketing Inc.) is a Delaware publicly-traded corporation and is regularly quoted in an over-the-counter market by a member of a national or affiliated securities association.  DarkPulse has a principal place of business at 350 5th Avenue 59th Floor, New York, NY 10118.

28.     DarkPulse is a global technology provider in the business of manufacturing, selling, installing, and servicing monitoring systems, including hardware and software that detects changes in the "structural health" of infrastructure.  DarkPulse's security solutions offer 24/7 monitoring of perimeters and detection of tunneling along national borders.  Attached as Exhibit B is a true and correct copy of DarkPulse's (f/k/a Klever Marketing Inc.'s) Restated Certificate of Incorporation ("Certificate of Incorporation") and By-Laws, as filed with the SEC as of June 20, 1997.

### G.  Defendant Dennis Michael O'Leary

29.     Defendant Dennis Michael O'Leary is an individual residing at 11 East 80th Street, Apartment 4B, New York, NY 10075.  Mr. O'Leary is President, Chief Executive Officer, and had assumed the position of sole Board member of DarkPulse prior to initial commencement of this action.

30.     Mr. O'Leary's previous employment includes working for the New York Police Department as a member of the Manhattan North Tactical Narcotics Team, which prosecuted establishments involved in the illegal distribution of narcotics.  As indicated in the Schedule 14F-1 SEC filing filed on May 4, 2018: "***Mr. O'Leary is not, and has not been during the past 5 years, the director of any other public companies***" (emphasis added).  Attached as Exhibit C is a true and correct copy of Schedule 14F-1 for Klever Marketing Inc. (n/k/a DarkPulse).

31.     According to DarkPulse's Schedule 14C filing, dated March 13, 2019, Mr. O'Leary beneficially owns 393,980,830 of DarkPulse's Common Stock (representing 81.29% of the outstanding Common Stock), and a total equivalent of voting of all Equity Shares of 405,882,000, representing a 67.14% voting power.  Attached as Exhibit A is a true and correct copy of DarkPulse's Schedule 14C filing, dated March 13, 2019 identifying such holdings.

32.     Upon information and belief, there are in excess of 920 shareholders of DarkPulse.

## FACTUAL BACKGROUND

### A.  Mr. O'Leary's Autocratic Control Over DarkPulse.

33.     On February 5, 2018, there was a Press Release announcing Dr. Cellucci's appointment as co-CEO of DarkPulse, in addition to having previously been elected to DarkPulse's Board of Directors.  In that press release, Mr. O'Leary stated: "We are pleased that Tom has agreed to accept this critical executive position.  He has shown the business acumen and speed-of-

execution the likes of which we have never seen." A true and correct copy of this Press Release is attached hereto as Exhibit D.

34.     Indeed, in the Schedule 14F-1 filed with the SEC as of May 4, 2018, the following statement appears under the heading "Board of Directors and Corporate Governance" for DarkPulse (then known as Klever Marketing, Inc.):

> Mr. O'Leary will become our Chief Executive Officer and Board Chairman, and Dr. Cellucci will become our Co-CEO and Director. *We do not intend to designate a lead independent director. We believe that this structure will be appropriate for the Company after Merger Time until such time as the Board may be expanded.* Specifically, we believe that the proposed leadership structure will provide sufficient leadership and engagement in our operations.

(emphasis added). Exhibit C.

35.     In furtherance of this joint commitment to strive to make DarkPulse an outstanding successful business, Dr. Cellucci invested a great deal of time and effort in his role as co-CEO and Board member. For example, he used his experience and knowledge in heading publicly traded companies to lead the efforts to take DarkPulse public in a Reverse Merger with Klever Marketing. This greatly advantaged DarkPulse and its shareholders.

36.     Dr. Cellucci also successfully secured significant business deals in Kazakhstan and Europe, again, for the substantial benefit of DarkPulse and its shareholders, where he made frequent visits and diverted his full attention and other responsibilities from his other businesses, as well as taking him away from his family. Mr. O'Leary has not demonstrated an ability to secure significant business deals for the benefit of DarkPulse. Nonetheless, as set forth in more detail herein, he wrongfully and capriciously ousted Dr. Cellucci, thereby wasting this resource (*i.e.*, Dr. Cellucci's ability to obtain business deals) of DarkPulse, to the detriment of the corporation.

37.     Similarly, DarkPulse was truly blessed with a talent-rich pool of Officers who came with impressive credentials and experiences, with MBAs and/or PhDs, graduates of prestigious

schools, and decades of valuable experience. DarkPulse's Officers were taking steps to fulfill DarkPulse's optimum potential. Nonetheless, as set forth in more detail herein, Mr. O'Leary wrongfully and capriciously ousted those Officers, thereby wasting these resources assets (*i.e.*, officers with these abilities) of DarkPulse, to the detriment of the corporation.

38.     Rather than relying on this talent pool, Mr. O'Leary, who lacked the attributes of Dr. Cellucci and the aforementioned-Officers, took unilateral steps to the exclusion of the Plaintiffs, to the detriment of DarkPulse and its shareholders, for his own exclusive benefit.

39.     Mr. O'Leary failed to undertake the duties and responsibilities in his fiduciary role as a controlling shareholder, co-CEO of a publicly-traded corporation, and Director and failed to comply with DarkPulse's certificate of incorporation and bylaws.

**B.  Non-Compliance With The Certificate Of Incorporation And By-Laws.**

40.     Article X of the Restated Certificate of Incorporation provides that:

*The governing board of the Corporation shall be known as the board of directors.* The number of directors comprising the board of directors shall be fixed and may be increased or decreased from time to time in the manner provided in the bylaws of the Corporation, except that *at no time shall there be less than three nor more than nine directors.*

(emphasis added). Exhibit B.

41.     Similarly, and consistently, Article 3, Section 1 of the By-Laws provides that: "The number of directors which shall constitute the whole board shall be not less than three nor more than nine." Exhibit B.

42.     As majority shareholder of DarkPulse, Mr. O'Leary had and still has the ability to determine what person or persons are elected as directors. In the exercise of that ability, Mr. O'Leary had only permitted two persons to be elected as directors, i.e., himself and Dr. Cellucci, since the reverse merger on July 18, 2018 and until his ouster of the Plaintiffs.

43.     In violation of both the Restated Certificate of Incorporation and the By-Laws, Mr. O'Leary has caused DarkPulse's affairs to be conducted without a duly constituted Board of Directors.

44.     When Dr. Cellucci joined the Board of DarkPulse, he sought to have the company comply with the requirements of its Restated Certificate of Incorporation and its By-Laws that the board of directors consist of no less than three members.  To that end, Dr. Cellucci recommended that the company appoint Rear Admiral James ("Gib") Basil Godwin, III, as the third member of the Board.  Rear Admiral Godwin was a Managing Director at Price Waterhouse Coopers since 2014, and among his prior civil positions, Rear Admiral Godwin served as a Vice President at Northrop Grumman Information Systems in the Cyber Security Domain; Dynamic Analytics and Test in the Modeling and Simulation domain and Athena Technologies, (now Rockwell Collins). Among his illustrious accomplishments in serving the US Navy for 30-years, Rear Admiral Godwin was the Program Executive Officer of Enterprise Information Systems, Program Manager of the Navy Marine Corps Intranet and Program Executive Officer of Tactical Aircraft.  While serving as the Director of the Navy Marine Corps Intranet (NMCI) in September 2004, he was responsible for delivering an enterprise-wide computer network for Navy and Marine Corps, one of the most transformational contracting initiatives ever undertaken by the Department of the Navy.  He is PM level 3 certified by the Defense Acquisition University and holds a Top-Secret Clearance.

45.     Given Rear Admiral Godwin's credentials, he was an excellent fit for what DarkPulse does, would significantly bolster DarkPulse's credibility, and his experience with government and military may have proved useful in securing new business opportunities.

46.     Rather than embrace Rear Admiral Godwin's addition as a third Board member, Mr. O'Leary confusingly said that DarkPulse "can't afford him" even though a Board member received no salary. Even more perplexing, Admiral Godwin is a member of the three-person Board of Directors of DarkPulse's wholly owned Canadian subsidiary, DarkPulse Technologies Inc, along with Mr. O'Leary and Dr. Cellucci. The failure of Mr. O'Leary to accept Rear Admiral Godwin as the third Board member was thus without any business justification.

47.     Thereafter, Dr. Cellucci kept raising with Mr. O'Leary the need to obtain a third Board member to comply with the Certificate of Incorporation and By-Law provisions. Mr. O'Leary repeatedly responded that he would do it, but that he never did (until after the filing of the original complaint in this matter). The failure of Mr. O'Leary to obtain a third Board member was without any business justification.

48.     Mr. O'Leary, without reason or justification, terminated Dr. Cellucci as a Director. However, there was no timely requisite SEC filing of this material event. This delayed disclosure was done in order for Mr. O'Leary to consummate funding from Crown Bridge Partners, LLC ("Crown Bridge"), a DarkPulse Noteholder, via a Securities Purchase Agreement, effective February 12, 2019, for the sale of a convertible promissory note. Seth Ahdoot, who on behalf of Crown Bridge negotiated the deal with DarkPulse, stated that he would not have provided funding had he known that Dr. Cellucci was no longer a Director.

49.     In or about February 14, 2019, a Pre-14C was filed to relay the fact that, as of February 7, 2019, Dr. Cellucci was removed as the non-controlling shareholder from the Board of Directors (DarkPulse earlier filed an 8-K on that date identifying the Crown Bridge funding). A comment letter was sent from the SEC, to which Mr. O'Leary sent a response. A DEF14C was filed on March 14, 2019.

12

50.     Prior to the filing of the DEF14C, an 8-K was filed on March 6, 2019 terminating Dr. Cellucci as the co-Chief Executive Officer by a *shareholder consent* document notwithstanding that Article V, Section 5 of the By-Laws requires any officer removal to be done by the board of directors and has no provision for removal by the shareholders. Similar 8-Ks were filed through this date terminating the other Plaintiff Officers of DarkPulse.

51.     The Officer terminations further violate Article V (Officers), Section 5 of the By-Laws, Mr. O'Leary has terminated the co-Chief Executive Officer, the Chief Financial Officer, the Chief Marketing Officer, and the Chief Technology Officer without a ready and suitable replacement. The referenced bylaw provision provides:

> The officers of the Corporation shall hold office until their successors are chosen and qualify.  Any officer elected or appointed by the board of directors may be removed at any time by the affirmative vote of a majority of the board of directors. Any vacancy occurring in any office of the Corporation shall be filled by the board of directors.

Here, there was no duly constituted board of directors consisting of at least three members, and therefore there was no majority of two members to remove the Officers when they were removed. In addition, no successors had been chosen and qualified at the time of the removal.

52.     DarkPulse has suffered by not having the diversity of a three or more member Board of Directors, and not having Officers at the ready to replace those who were terminated.

53.     Having Mr. O'Leary, who was not experience in running a publicly traded company, caused DarkPulse to stagnate for a significant period of time.  Even after the appointment of two additional directors (which only occurred after the first complaint in this action was filed), the damage had already been done, and DarkPulse's stock value has continued to fall.

13

### C. Ignoring Auditors' Requests And Conversion, Dilution, And Waste Of Corporate Assets.

54.     Time and time again, Mr. O'Leary failed to provide necessary documents and information requested (as required by law) from DarkPulse's auditors.

55.     DarkPulse's auditors have questioned Mr. O'Leary's travel expenses which are not supported by receipts/documentation provided.  Mr. O'Leary has failed to explain his entitlement to reimbursement of such undocumented claimed travel expenses.

56.     Given the sensitivity of the technology that DarkPulse is involved with, it has been troublesome to discover that there is a separate company that Mr. O'Leary was involved with. Julian Joshua Aranov and Ramey Adelievich Rebea created a company called DarkPulse East, LLC ("DarkPulse East"), a Russian company.  Mr. Goodman, DarkPulse's CFO, only learned about this company in September 2018, through a 2017 audit, notwithstanding that DarkPulse East was formed on December 8, 2017.

57.     Aside from Mr. O'Leary, and a few emails from Mr. Aranov providing information/documents requested by Mr. Goodman, neither the Plaintiffs nor any known DarkPulse employee had any contact with DarkPulse East.

58.     According to DarkPulse's April 16, 2019 10-K for the fiscal year ended December 31, 2018:

> The Company [DarkPulse] does not own any interest in DarkPulse East LLC, ("DPE") an entity organized on December 8, 2017 in Russia, by two of the shareholders of DPTIDel, to act as a sales organization to promote the Company's products within Russia. Each of the two shareholders own 50% interest in DPE. During November and December 2017 DPTINY funded DarkPulse East LLC a total of $20,650 to establish and launch the Company's business in Russia. The Company is considered to be the primary beneficiary of DPE based on implicit obligations to fund it, and accordingly, the operations of DPE are consolidated into these financial statements. As of December 31, 2018, DPE had no assets or liabilities. The Company is not liable for obligations of DPE, and creditors of DPE do not have recourse to the general credit of the Company.

59.     While there is no ownership by DarkPulse Inc in DarkPulse East, in 2017 DarkPulse's auditor determined that DarkPulse East was a Variable Interest Entity (VIE).

60.     A VIE is a legal business structure such that an investor has a controlling interest notwithstanding lacking the majority of voting rights. VIEs usually lack financial resources to independently support an ongoing business. An entity that is the primary beneficiary of a VIE must disclose the holdings of that entity as part of its consolidated balance sheet.

61.     The discovery of DarkPulse East only though an audit of DarkPulse, Inc. (rather then through disclosure by Mr. O'Leary) and its designation as a VIE is indictive of there being some business relations between the two entities.  When coupled with Mr. O'Leary's expressed ambition to sell the DarkPulse technology in Russia, the creation of a DarkPulse entity in Russia that is not wholly owned by DarkPulse, and his non-disclosure of DarkPulse East shows that there was a separate related entity kept hidden from DarkPulse's shareholders.  The business relationship between these entities, and DarkPulse East's activities in Russia have also been kept hidden from DarkPulse's shareholders and Plaintiffs during the time when they were Officers of DarkPulse.

62.     Indeed, following the discovery of its existence, Mr. O'Leary was expressly asked by Mr. Goodman about DarkPulse East and the nature of his interest.  Mr. O'Leary refused to provide a response.

63.     On or about July 7, 2017, Mr. O'Leary formed DarkPulse Technologies International, Inc., a New York corporation ("DPTI-NY").

64.     Keary Mason, an individual investor, who owned approximately 1% of DPTI-NY, invested $37,500 in DPTI-NY in 2017.

65.     Sometime between October and December 2017, Mr. O'Leary wired $20,650 from the DPTI-NY account to Mr. Aranov (who would eventually co-form DarkPulse East) to establish

an office in Russia.  Moreover, Mr. O'Leary sent $20,650 from DarkPulse to that individual's

personal account, which was caught by DarkPulse's auditors in 2018.  Such diversion of funds by

Mr. O'Leary without notice or explanation to Mr. Goodman, DarkPulse's then-Chief Financial

Officer, was improper.

66.     Because New York does not allow the stock structure that Delaware does, on or

about December 27, 2018, Mr. O'Leary formed DarkPulse Technologies International, Inc., a

Delaware corporation ("DPTI-Del").  DTPI-Del now owns 100% of DPTI-NY.  DarkPulse owns

37.572% of DPTI-Del.

67.     DarkPulse East as a VIE, and DPTI-NY and thereafter DPTI-Del as partially-

owned DarkPulse entities, engaged in business dealings in Russia.  Mr. O'Leary repeatedly

advised several of the Plaintiffs that he was going to Russia to market certain technology (Brillouin

Optical Time Domain Analysis).  It was later discovered that rather than going through DarkPulse

itself, such business discussions were done through the auspices of DarkPulse East and/or one of

the DPTI entities.  Mr. O'Leary never tendered any business justification for conducting such

business discussions through these entities instead of through DarkPulse.

68.     Thus, rather than DarkPulse Inc. being the beneficiary of 100% of the Russian

business being conducted through DarkPulse East, DTPI-Del and DPTI-NY, Mr. O'Leary created

this structure whereby Dark Pulse Inc. is only the beneficiary of 37.572% of such transaction done

under the auspices of DTPI-Del and DPTI-NY, and his equity holding in DarkPulse East.  In doing

so, in the case of DTPI-Del and DPTI-NY, he has diverted approximately 63% of benefits from

opportunities that would be available to DarkPulse for the benefit of other entities controlled by

Mr. O'Leary and as to whom he has not disclosed the ownership of that approximately 63%

interest. Discovery is necessary to determine Mr. O'Leary's interest in DarkPulse East, a company that he has kept hidden, as well as the business that has been conducted through this entity.

69.     None of the Officers or Dr. Cellucci knew of DarkPulse East, let alone formed it. Accordingly, Mr. O'Leary is the only person who could have created DarkPulse East as a VIE entity to DarkPulse.

70.     Mr. O'Leary directed DarkPulse's research and development personnel to work on Russian business for DarkPulse East, PTPI-Del and DPTI-NY at the expense for their work on exclusively DarkPulse projects. By way of example, Mr. O'Leary has directed that engineering efforts be diverted from two existing projects for a real Kazakhstan deal in favor of marketing an unclosed deal in Russia. Specifically, Mr. O'Leary insisted that the engineering team ignore the Kazakhstan project, even if it meant that any such deal would be cancelled.

71.     Accordingly, DarkPulse has been providing a portion of its assets, funding, and resources to DarkPulse East as well as DPTI-NY and thereafter DPTI-Del. None of these companies has ever contributed any demonstrative funding for prospective Russian business. By way of example, DarkPulse, and not DPTI-NY nor DPTI-Del, paid for the expenses for various trips that Mr. O'Leary made to Russia for demonstrations, and for the development of the demonstrations for any proposed Russian project.

72.     Further troubling is that Mr. O'Leary stated that he did not know whether Mr. Aranov (a person with whom Mr. O'Leary worked with for some time at DarkPulse) was a US citizen. This individual maintained addresses in both New York City and Russia. This failure to know whether Mr. Aranov is not a U.S. citizen evidences that Mr. O'Leary is oblivious to whether or not DarkPulse may violate export control laws and regulations to the civil and criminal detriment of DarkPulse.

73.     The resources diverted from DarkPulse to DPTI-NY and DPTI-Del constituted a diversion of corporate opportunity and corporate waste, because instead of benefiting 100% for work performed on DarkPulse projects, as a near 50% shareholder of DPTI-NY at the end of 2017, and as a 37.572% shareholder of DPTI-Del, DarkPulse would garner a substantially less return on investment from such diverted resources.

74.     As a shareholder in DPTI-NY and DPTI-Del, and his ability to use DarkPulse's personnel and resources for the benefit of these other companies, Mr. O'Leary personally benefitted from the diversion of DarkPulse's corporate assets to DPTI-NY, DPTI-Del, and apparently to DarkPulse East.

75.     For DarkPulse's 2018 audit, the company's auditors raised questions, particularly concerning finances, and the risk level of the audit to Mr. Goodman, who responded to these information requests.  David Irizarry, an auditor with the Haynie & Company (DarkPulse's then accounting firm) participated in a telephone call with Mr. O'Leary.  According to Mr. Irizarry, Mr. O'Leary stated his desire to know "who was loyal to him" as opposed to DarkPulse.  On March 11, 2019, Mr. O'Leary unilaterally terminated Haynie & Company as indicated in the Form 8-K filed on March 11, 2019, Item 4.01 ("Change in Registrants Certifying Accountant").  A true and correct copy of this Form 8-K is attached hereto as Exhibit E.  Mr. O'Leary never provided Mr. Goodman or anyone else at DarkPulse with a reason or justification for the termination.  Moreover, the termination at this time was unusual given the need for DarkPulse's required 10-Q filing.

76.     From this termination of the auditors shortly after the completion of the audit and its uncovering and reporting of DarkPulse East, the auditors were foreclosed from further investigating the DarkPulse East entity.  Similarly, the termination of the plaintiffs herein likewise placed a roadblock in any independent investigation of DarkPulse East and its activities in

relationship to DarkPulse and its technology and resources.  Through the terminations of the auditors and the Plaintiffs, Mr. O'Leary has succeeded in covering up his apparent self-serving involvement with DarkPulse East.

77.     In addition, Mr. O'Leary, on a telephone conference call that included Dr. Cellucci and Stephen M. Fleming, Esq., refused to state or provide in writing that he did not have any "side deals" with any individuals related to Russian entities, including, but not limited to DPTI-Del and DarkPulse East that DarkPulse's Officers discovered through an auditing process.  This refusal to disavow "side deals" constitutes an admission by silence that Mr. O'Leary did have "side deals."

78.     Accordingly, through his actions, Mr. O'Leary furthered his concealment of the relations and investigation into the transactions between DarkPulse, DPTI-Del, DPTI-NY, and DarkPulse East to cover-up his placing of his own interests above those of DarkPulse, and to the detriment of DarkPulse's shareholders.

79.     Additionally, DarkPulse uses Brillouin Optical Time Domain Analysis ("BOTDA") to monitor strain and temperature over a long distance (e.g., for a pipeline). Recently, Mr. O'Leary's counsel requested the return of a BOTDA system prototype from Dr. Banash.  On May 3, 2019, Dr. Banash sent the device via overnight mail to Mr. O'Leary's counsel with a letter, stating concerns that the system may be subject to the approval of the Committee on Foreign Investment in the United States ("CFIUS").  CFIUS is charged with evaluating whether certain transactions may affect our national security.  31 CFR Part 800.

80.     Several component parts manufacturers (e.g., Dynamic Signal Inc. and Advanced Fiber Resources) of the BOTDA "box" had contacted Dr. Banash and advised him that ECCN restrictions under the Export Administration Regulations, 15 CFR § 730 et seq., applied to their components (e.g., a gage card).  Plaintiffs are concerned that if the component parts manufacturers

learned that their parts were being exported contrary to their understanding of the ECCN, that they would decline to continue to do business with DarkPulse. Further, if a component is restricted under the Export Administration Regulations, it is probable that a product containing that restricted technology would itself be restricted.

81.     As a result, plaintiffs' counsel asked Mr. O'Leary's law firm in this matter to hold the BOTDA system in escrow. Mr. O'Leary's counsel replied that Mr. O'Leary still intended to send the BOTDA system to Canada and then to Russia. Plaintiffs have a real concern that this places DarkPulse at risk for being subject to criminal penalties and civil actions.

82.     Prior versions of the BOTDA "box" had been taken by Mr. O'Leary to Russia. Mr. O'Leary, through counsel, claims that this was permissible under the auspices of the United States Department of State.

83.     The Department of State is only *one* governmental agency that has authority to consider the potential threat that such technology introduced to an adversary nation may pose. The Department of Treasury's Committee on Foreign Investment in the United States, Office of Investment Security, and the Department of Commerce (and within that agency, its Bureau of Industrial Security) *also* have authority over evaluating a risk that technology could pose if provided to a foreign adversary. For the benefit of DarkPulse (as well as the nation), such agencies should be consulted before this technology is shipped to Russia.

84.     As CTO, Dr. Banash never saw any authority from the Departments of State, Treasury, or Commerce authorizing the conveyance of this technology to Russia, let alone consultation with these agencies to see if such transfer were permissible.

### D. Mr. O'Leary's Mismanagement And Missed Opportunities.

85.　Mr. O'Leary's conduct shows a lack of commitment to DarkPulse to the detriment of DarkPulse and its stockholders.

86.　He routinely missed important meetings/telephone calls with potential investors, including those meetings that he personally requested. Such meetings could have resulted in an infusion of much needed working capital for DarkPulse.

87.　Rather than working in conjunction with his skilled Officers, Mr. O'Leary took it upon himself to handle a demonstration of technology in Russia as the *de facto* Program Manager. This was inappropriate, given his lack of involvement in ensuring that: a) the system worked before it left North America; and b) a check-list had been completed to perform a professional demonstration, and c) the DarkPulse Russian personnel could have better assisted him. Additionally, Mr. O'Leary failed to take an active/aggressive role in solving the issues that arose during his demonstration. Such failure has been detrimental to DarkPulse's ability to receive orders/cash from that customer.

88.　Moreover, Mr. O'Leary directed that engineering efforts be diverted from two existing projects for  a real Kazakhstan deal in favor of marketing an unclosed deal in Russia. Specifically, Mr. O'Leary insisted that the engineering team ignore the Kazakhstan project, even if it meant that any such deal would be cancelled.

89.　Mr. O'Leary insisted on DarkPulse's use of a developmental software program (MATLAB) that then-Chief Technology Officer Dr. Banash has repeatedly advised is neither suitable nor appropriate due to serious security concerns with that software program. In doing so, Mr. O'Leary has compromised the integrity of the DarkPulse product which concomitantly reduces the salability of the product.

90.     Moreover, it was learned that portions of the MATLAB code with which Mr. O'Leary desired to have the DarkPulse Engineering team work was developed by the University of New Brunswick for NB (New Brunswick) Power, the province's main utility company. Accordingly, such proprietary code portions were legally the property of a different entity, and had it been utilized, would have exposed DarkPulse to costly intellectual property litigation.

91.     Notwithstanding having a Princeton PhD as DarkPulse's Chief Technology Officer, Mr. O'Leary wanted to hire Michael Wylie, although he would still continue an employee of DarkPulse's competitor, Paulsson, to rewrite the MATLAB code for Russia. Mr. O'Leary brought in a programmer on a project only known as "George" with the sole identifying feature being a Skype name, and provided no background/credential information or resume for such individual as requested by Dr. Banash.

92.     While Mr. O'Leary claimed to be open to receiving a marketing plan to sell DarkPulse's systems, he did not want to expend any budget in that area, nor otherwise provide the help and resources necessary to garner additional business for the company and enhance the stockholders' investments. The failure to develop and have a marketing plan for DarkPulse's systems can only have the effect of reducing the sales DarkPulse might otherwise have made.

93.     As then-Chief Marketing Officer, Mr. Singer sought to exploit and boast for DarkPulse's benefit how the company's technology was successfully used for a mining application in Arizona and for a dam in Canada. Mr. Singer repeatedly requested the testing documents from Mr. O'Leary, who responded that he had lost the documents, as well as photos from Arizona, and had nothing from the dam in Canada. This casual carelessness of Mr. O'Leary prevented marketing opportunities that would have been beneficial to DarkPulse.

94.     Similarly, on several occasions Mr. Singer asked Mr. O'Leary for all the current agreements with DarkPulse's "partners" for use in business promotion. Mr. O'Leary only provided one agreement, and this was for one that had been inactive for years.

95.     On the other side of the coin, Mr. Singer presented several viable partnership opportunities and projects which Mr. O'Leary summarily rejected without explanation or justification.  Mr. O'Leary maintained that the focus had to be on Russia and everything else was "on hold or to ignore."

96.     As a result of Mr. O'Leary's action (and inaction), DarkPulse has lost marketing opportunities to its detriment.  Lost marketing opportunities made no sense.  For example, Mr. Singer was invited to Houston to meet the Senior Director for Assets of Pacific Gas & Electric Company.  Although the cost would have been less than $500, Mr. O'Leary denied Mr. Singer's request to attend this meeting.

97.     Mr. O'Leary's attention was also diverted through his operation of a Tour Company, "Guides Of New York."

**E.  Outstanding Compensation Owed To Several Of The Plaintiffs.**

98.     DarkPulse entered into separate oral agreements with Dr. Cellucci, Mr. Goodman, Mr. Singer, and Dr. Banash.

99.     With respect to Dr. Cellucci, he was to receive $16,000 per month, payable as $8,000 in a paycheck each month, with each remaining monthly $8,000 to be accrued and paid to Dr. Cellucci once DarkPulse raised sufficient working capital (hereinafter referred to as "deferred compensation").

100.    Similarly, with respect to Mr. Goodman, Mr. Singer, and Dr. Banash, each were to receive $12,000 per month, payable as $6,000 in a paycheck each month, with each remaining

monthly $6,000 to be accrued and paid to each of these employees once DarkPulse raised sufficient working capital ("deferred compensation").

101.    Dr. Cellucci faithfully and diligently performed his services as required from a co-Chief Executive Officer.  His oral contractual employment duties included, among other things, soliciting business deals and opportunities on behalf of DarkPulse and helping to run the operations of DarkPulse.

102.    Mr. Goodman faithfully and diligently performed his services as required from a Chief Financial Officer.  His oral contractual employment duties included, among other things, ensuring that the books, records, and finances of DarkPulse were properly reported, dealing with accountants and auditors, and ensuring that SEC filings were properly made.

103.    Mr. Singer faithfully and diligently performed his services as required from a Chief Marketing Officer.  His oral contractual employment duties included, among other things, developing opportunities to appropriately advertise and market DarkPulse's products and technology and assist in soliciting business opportunities and preparing promotional presentation material beneficial for DarkPulse.

104.    Dr. Banash faithfully and diligently performed his services as required from a Chief Technology Officer.  His oral contractual duties included, among other things, supervising, planning, and assisting in the development of technology within DarkPulse's business, supervising personnel towards these endeavors, and identifying and working with component part manufacturers and suppliers for the benefit of DarkPulse's technology development.

105.    As part of his duties as Chief Financial Officer, Mr. Goodman knew that DarkPulse's accounting books and records showed accounts payable for employee wages as delineated below.

106.    At the time of his termination, Dr. Cellucci was owed $56,000 in deferred compensation. To date, this amount remains unpaid by DarkPulse.

107.    At the time of his termination, Mr. Goodman was owed $45,200 in deferred compensation. To date, this amount remains unpaid by DarkPulse.

108.    At the time of his termination, Mr. Singer was owed $49,600 in deferred compensation. To date, this amount remains unpaid by DarkPulse.

109.    At the time of his termination, Dr. Banash was owed $49,200 in deferred compensation. To date, this amount remains unpaid by DarkPulse.

110.    As reported in a DEF14C filed by DarkPulse on January 29, 2020, DarkPulse acquired working capital that would have been available to pay the aforementioned deferred compensation, at least in part:

> On April 23, 2019, the Company entered into a securities purchase agreement with GS Capital Partners, LLC, ("GS Capital") issuing to GS Capital a convertible promissory note in the aggregate principal amount of $40,000 with a $2,000 original issue discount and $2,000 in transactional expenses due to GS Capital and its counsel. The note bears interest at 8% per annum and may be converted into common shares of the Company's common stock at a conversion price equal to 70% of the average of the three lowest trading prices of the Company's common stock during the 20 prior trading days. As of the date the consolidated financial statements were available for issuance, DPI received $36,000 net cash.

> On May 3, 2019, the Company entered into a securities purchase agreement with Geneva Roth Remark Holdings, Inc. ("Geneva") pursuant to which the Company issued to Geneva a convertible promissory note (the "Geneva Note") in the aggregate principal amount of $64,000, with a $6,000 original issue discount and $2,800 in expenses for Geneva's legal and due diligence fees, resulting in a purchase price of $55,200. The Geneva Note bears interest at 9% per annum and may be converted into common shares of the Company's common stock at a conversion price equal to 70% of the lowest trading price of the Company's common stock during the 20 prior trading days. The Company received $55,200 net cash on May 2, 2019 in consideration of the issuance of the Geneva Note to Geneva.

111.   In violation of SEC requirements, DarkPulse failed to file 8-Ks for the April 23, 2019 and May 3 2019 capital funding, despite the fact they are material definitive agreements and created a direct financial obligation and sale of an unregistered equity security.

**F.  Plaintiffs Are Excused From Making A Demand Upon The Board.**

112.   Plaintiffs originally brought this action both directly to vindicate their individual rights, as well as derivatively on behalf of DarkPulse.  To the extent required, a demand at the time suit was commenced upon the "Board of the Directors" as envisioned by Mr. O'Leary – i.e., Mr. O'Leary alone –  would be futile because: (i) Mr. O'Leary has repeatedly violated DarkPulse's Articles of Incorporation and By-Laws; (ii) consistently excluded Plaintiffs' rights, whether as shareholders, Officers, or Director, in unilaterally undertaking unsanctioned actions; (iii) excluding Dr. Cellucci, Mr. O'Leary, as the sole Director at the time of the commencement of this action, is personally interested in the transactions evidenced by Plaintiffs' allegations and/or the lack of independence of the DarkPulse "Board" from Mr. O'Leary; (iv) Mr. O'Leary failed to inform and/or educate himself to the degree reasonably necessary to comply with DarkPulse's obligations as a publicly-traded corporation; and/or (v) Mr. O'Leary's failure to exercise sound business judgment in the performance of his responsibilities.

113.   Mr. O'Leary and DarkPulse, through the filing of the Schedule 14C announcing the removal of Dr. Cellucci as a Director of the company, has taken the position that Dr. Cellucci is no longer a Director stating that such action was "ratified by the Board of Directors of the Company (the "Board") on February 7, 2019."  However, Dr. Cellucci was the only other Board member, and no notice was given to him of such vote, and had there been a vote, it would have been deadlocked.   Additionally, Mr. O'Leary's unilateral attempt to terminate DarkPulse's

Officers eviscerated the management of that company. For these reasons as well, Plaintiffs should be excused from making a demand to DarkPulse's Board.

114. Further, and as alleged with particularity herein, it is evident that Mr. O'Leary, who owns the majority of the shares of DarkPulse, has actively and constructively participated in the wasting, misappropriation and/or conversion of corporate assets.

115. Mr. O'Leary has reason to deny Plaintiffs' allegations and stands to gain a personal benefit from the elimination of Plaintiffs' management role from DarkPulse that is different from that received by all shareholders, and as such constitutes Mr. O'Leary as being an interested Director. For this independent reason, Plaintiffs should be excused from making a demand upon DarkPulse's Board.

116. Moreover, in addition to being a Director, Mr. O'Leary is also an Officer (a co-CEO, or as he would have it, the lone CEO) of DarkPulse, and in the dual capacity as an Officer and Director, he has been both directly implicated and involved in the improper acts, as well as having failed to remedy the repeated instances of illegal conduct. Further, he is a stockholder who in fact controls the management of DarkPulse. For these additional reasons, Plaintiffs should be excused from making a demand upon DarkPulse's Board.

117. The filed SEC documents demonstrate a lack of sound business judgment on behalf of Mr. O'Leary. In addition to unfairly and improperly excluding Plaintiffs from the management of the company, and without consideration to their rights as shareholders, the filed SEC documents are outright false. At times they fail to report key events, and at other times they report events that did not take place. According, this provides another separate basis for excusing Plaintiffs from making a demand upon DarkPulse's Board.

118.   Although after the filing of the Complaint in this action, in apparent recognition that he was acting in violation of the Certificate of Incorporation and By-laws by causing DarkPulse to have less than three directors, Mr. O'Leary appointed two persons to act as additional directors.  It appears that these persons are not, and do not act, independent of Mr. O'Leary. Indeed, one of the Board members, Anthony Brown, is beholden to Mr. O'Leary for providing him with work for DarkPulse, thereby tainting his independence.  Accordingly, this provides a separate basis for excusing Plaintiffs from making a demand on DarkPulse's Board after the filing of the initial complaint.

119.   Moreover, the acts and transactions complained of in the amendment are essentially the same as the act or transaction challenged in the original complaint.

120.   Nonetheless, in an exercise of abundant caution, on May 11, 2020, Plaintiffs emailed to DarkPulse's counsel and Mr. O'Leary, on behalf of the Board of Directors, a 23.1 Demand Letter.  A true and correct copy of such Demand Letter is attached hereto as Exhibit F. To date, the current Board of Directors failed to take any action, or even indicate that they will take any action.

**G.  Not A Collusive Action**

121.   This action is not, and by the very facts contained herein cannot, be a collusive one to confer jurisdiction that this Court would otherwise lack.

122.   First, none of the Plaintiffs are residents of New York.  Dr. Cellucci resides in Virginia, Mr. Goodman resides in Arizona, Mr. Singer resides in Colorado, Dr. Banash resides in New Hampshire, and Mr. Campbell resides in California.

123.   Second, Defendant Dennis Michael O'Leary, as well as DarkPulse, reside in New York.

### H. Inapplicability Of The Business Judgment Rule

124.    As identified above, Mr. O'Leary engaged in conduct that was not a legitimate exercise of business judgment and/or was *ultra vires*. Ultimately, DarkPulse and its shareholders were damaged as a direct result of Mr. O'Leary's rampant misconduct, willful mismanagement, and lack of necessary internal controls (i.e., staffing the requisite Board of Directors, having ready and suitable replacements of Officers following their termination, and terminating DarkPulse's auditors because they failed the "O'Leary Loyalty Test). Moreover, the business judgment rule is a defense which has not yet been pleaded and is a matter as to which Mr. O'Leary will have to bear the burden of proof at trial. Therefore, the protections of the business judgment rule do not apply when reviewing Mr. O'Leary's actions or decisions in the management of DarkPulse.

## FIRST CAUSE OF ACTION
### (Derivative and Plaintiffs' Individual Claims Against Mr. O'Leary for Breach of Fiduciary Duties)

125.    Plaintiffs repeat and reallege all prior allegations of this Complaint as though fully set forth herein.

126.    Plaintiffs are minority shareholders of the outstanding shares of DarkPulse.

127.    As set forth herein, as Director of DarkPulse and as a stockholder who controls the management of DarkPulse, Mr. O'Leary owed and continues to owe to DarkPulse and its shareholders the highest fiduciary duties of loyalty, good faith, and fair dealing.

128.    As set forth herein, in committing multiple acts of misconduct, Mr. O'Leary repeatedly breached his fiduciary duties to DarkPulse and its shareholders, including but not limited to, failing to follow the requirements of the Certificate of Incorporation, By-Laws, SEC rules and regulations.

129. Mr. O'Leary's actions as set forth hereinabove are the result of a knowing and deliberate indifference to the potential risk of harm to DarkPulse.

130. Mr. O'Leary and DarkPulse had no valid reason for terminating, essentially *en masse*, Plaintiffs Dr. Cellucci, Mr. Goodman, Mr. Singer, and Dr. Banash.

131. Their termination constituted a breach of each of their oral employment agreements.

132. Among the adverse results from Mr. O'Leary's breaches and misconduct brought about the rapid diminution of the value of DarkPulse and the impairment of its reputation, which are seriously placing DarkPulse's future existence in question.

133. As a result of his breach of his fiduciary duties, Mr. O'Leary is liable to DarkPulse and its shareholders.

134. As a result of Defendants' breaches, Defendants are liable to Plaintiffs Dr. Cellucci, Mr. Goodman, Mr. Singer, and Dr. Banash individually.

## SECOND CAUSE OF ACTION
### (Derivative Claim Against Mr. O'Leary for Breach of Duty of Loyalty for Waste of Corporate Assets)

135. Plaintiffs repeat and reallege all prior allegations of this Complaint as though fully set forth herein.

136. Plaintiffs are minority shareholders of the outstanding shares of DarkPulse.

137. As set forth herein, Mr O'Leary's transfer of technology, monies, and manpower to entities (DPTI-NY and thereafter DPTI-Del as partially-owned DarkPulse entities and DarkPulse East as a VIE) for which DarkPulse had a minimal or non-equitable interest, DarkPulse's resources resulted in the conversion, dilution and wasting of corporate assets.

138.    As a result of the waste of corporate assets, Mr. O'Leary is liable to DarkPulse and its shareholders.

## THIRD CAUSE OF ACTION
### (Derivative Claim Against Mr. O'Leary for Breach of Duty of Care Based on Chronic Mismanagement)

139.    Plaintiffs repeat and reallege all prior allegations of this Complaint as though fully set forth herein.

140.    Plaintiffs are minority shareholders of the outstanding shares of DarkPulse.

141.    As set forth herein, Mr. O'Leary's lack of dedication as Director and majority shareholder of DarkPulse brought about chronic mismanagement.  Such actions and inactions include his failure to use DarkPulse's Officers within their chose roles and instead taking them upon himself despite lacking the capability to do so, his failure to participate in investor meetings (several which he directed be convened) to attempt to bring in needed working capital, his direction that DarkPulse's limited resources focus on potential deals rather than deals that were realizable, acting contrary to the expressed export control concerns of component manufacturers thus endangering their supply, and his unnecessary expenditures.

142.    As a result of the waste of Mr. O'Leary's chronic mismanagement, he is liable to DarkPulse and its shareholders.

## FOURTH CAUSE OF ACTION
### (Plaintiffs' Claims Against Defendants for Failing to Pay Compensation)

143.    Plaintiffs repeat and reallege all prior allegations of this Complaint as though fully set forth herein.

144.    Plaintiffs Dr. Cellucci, Mr. Goodman, Mr. Singer, and Dr. Banash are owed compensation upon the receipt of working capital.

145.    As set forth herein, working capital as been received by DarkPulse, but no payment for wages earned have been made.

146.    As a result of Defendants' failure to pay compensation to the aforementioned Plaintiffs, Defendants are liable to Plaintiffs Dr. Cellucci, Mr. Goodman, Mr. Singer, and Dr. Banash individually.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of DarkPulse and individually, demands judgment as follows:

A. Against Mr. O'Leary and in favor of DarkPulse's shareholders, the amount of damages sustained by DarkPulse as a result of Mr. O'Leary's breaches of his fiduciary duties, his duty of loyalty for the waste of corporate assets, and his duty of care based on chronic mismanagement;

B. Against Mr. O'Leary and DarkPulse and in favor of Plaintiffs Dr. Cellucci, Mr. Goodman, Mr. Singer, and Dr. Banash, the deferred compensation owed to each of them;

C. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

D. Awarding to Plaintiffs punitive damages; and

E. Granting such other and further relief as the Court deems just and proper.

Dated: New York, NY
     May 15, 2020

JARDIM, MEISNER & SUSSER, P.C.

BENNET SUSSER, ESQ.
Attorney for Plaintiffs
420 Lexington Avenue; Suite 300-19
New York, NY 10170
Tel: (646) 205-8038
Fax: (973) 845-7645
bennet@jmslawyers.com

## VERIFICATION

I, THE HON. THOMAS A. CELLUCCI, PhD, MBA, hereby declare:

1.      I am a named plaintiff in this case and was the former co-Chief Executive Officer and a Member of the Board of Directors of DarkPulse, Inc.

2.      I hereby verify that I was a shareholder of DarkPulse at all times that the claims and allegations asserted in this Verified Second Amended Complaint ("Complaint") occurred.

3.      Additionally, I have reviewed the allegations made in this Complaint and as to those allegations about which I have personal knowledge, those allegations are true.  As to those allegations about which I do not have personal knowledge, I rely on information provided by the other named plaintiffs in this action and my counsel and their investigation and believe them to be true.

4.      Having received a copy of the Complaint and having reviewed it with my counsel and the other named plaintiffs, I hereby authorize its filing.

I hereby declare under penalty of perjury that the above statements are true and correct.

Executed on: May 14, 2020

_____

THE HON. THOMAS A. CELLUCCI. PhD, MBA

## **VERIFICATION**

I, DAVID D. SINGER, hereby declare:

1.      I am a named plaintiff in this case and was the former Chief Marketing Officer of DarkPulse, Inc.

2.      I hereby verify that I was a shareholder of DarkPulse at all times that the claims and allegations asserted in this Verified Second Amended Complaint ("Complaint") occurred.

3.      Additionally, I have reviewed the allegations made in this Complaint and as to those allegations about which I have personal knowledge, those allegations are true.   As to those allegations about which I do not have personal knowledge, I rely on information provided by the other named plaintiffs in this action and my counsel and their investigation and believe them to be true.

4.      Having received a copy of the Complaint and having reviewed it with my counsel and the other named plaintiffs, I hereby authorize its filing.

I hereby declare under penalty of perjury that the above statements are true and correct.

Executed on: May 14, 2020

_____
DAVID D. SINGER

## VERIFICATION

I, STEPHEN GOODMAN, MBA, ESQ., hereby declare:

1.     I am a named plaintiff in this case and was the former Chief Financial Officer of DarkPulse, Inc.

2.     I hereby verify that I was a shareholder of DarkPulse at all times that the claims and allegations asserted in this Verified Second Amended Complaint ("Complaint") occurred.

3.     Additionally, I have reviewed the allegations made in this Complaint and as to those allegations about which I have personal knowledge, those allegations are true.  As to those allegations about which I do not have personal knowledge, I rely on information provided by the other named plaintiffs in this action and my counsel and their investigation and believe them to be true.

4.     Having received a copy of the Complaint and having reviewed it with my counsel and the other named plaintiffs, I hereby authorize its filing.

I hereby declare under penalty of perjury that the above statements are true and correct.

Executed on: May 14, 2020

_____
STEPHEN GOODMAN, MBA, ESQ.

36

## VERIFICATION

I, ROBERT ALLAN CAMPBELL, MBA, hereby declare:

1.      I am a named plaintiff in this case.

2.      I hereby verify that I was a shareholder of DarkPulse at all times that the claims and allegations asserted in this Verified Second Amended Complaint ("Complaint") occurred.

3.      Additionally, I have reviewed the allegations made in this Complaint and as to those allegations about which I have personal knowledge, those allegations are true.  As to those allegations about which I do not have personal knowledge, I rely on information provided by the other named plaintiffs in this action and my counsel and their investigation and believe them to be true.

4.      Having received a copy of the Complaint and having reviewed it with my counsel and the other named plaintiffs, I hereby authorize its filing.

I hereby declare under penalty of perjury that the above statements are true and correct.

Executed on: May 14, 2020

ROBERT ALLAN CAMPBELL, MBA

## VERIFICATION

I, MARK A BANASH, PhD, MBA, hereby declare:

1.     I am a named plaintiff in this case and was the former Chief Technology Officer of DarkPulse, Inc.

2.     I hereby verify that I was a shareholder of DarkPulse at all times that the claims and allegations asserted in this Verified Second Amended Complaint ("Complaint") occurred.

3.     Additionally, I have reviewed the allegations made in this Complaint and as to those allegations about which I have personal knowledge, those allegations are true.  As to those allegations about which I do not have personal knowledge, I rely on information provided by the other named plaintiffs in this action and my counsel and their investigation and believe them to be true.

4.     Having received a copy of the Complaint and having reviewed it with my counsel and the other named plaintiffs, I hereby authorize its filing.

I hereby declare under penalty of perjury that the above statements are true and correct.

Executed on: May 14, 2020

_____
MARK A BANASH, PhD, MBA